The next matter, number 23-1747, Financial Oversight and Management Board, et al. v. AmeriNational Community Services, LLC, et al. At this time, would Counsel for the Appellate Cancer Cats Collateral Monitor please introduce himself on the record to begin? Good morning, Your Honors. May it please the Court, Benjamin Kamenetsky of Davis Polk for the Collateral Monitor. May I reserve two minutes for rebuttal? Yes, you may. Just in terms of who's doing what, my colleague, Mr. Zerbani, Counsel for the Servicer, will be handling the issues of standing and mootness. The government parties and the PFC bondholders would have you believe that this is basically a case about a term sheet superseded by final documentation. That the term sheet, what we call the RSA, the Restructuring Support Agreement, setting forth the agreed terms to the qualified modification, had the valid claim requirement that unless certain conditions would be met, these additional bonds would not be issued. But the final contract, what's called the definitive documents with a capital D, with two capital Ds, did not contain such requirements such that these additional bonds could be issued at the absolute discretion of the GDB and AFOF. Now this paradigm... Besides the RSA term sheet and the District Court's 2018 modification order, is the phrase definitive documents defined anywhere else? In particular, is it defined either in the MTA or in the bond indenture? I don't believe so, Your Honor. I think the definition of definitive documents that we've all been relying on and looking at from the beginning of time is the definition in the RSA at... Now, this paradigm is absolutely wrong. Why is that? Because we're not talking about private contracts. We're talking about an exacting lengthy process created by PERMISA called the Title VI Qualified Modification. And this was the first one ever done. Title VI mandates, among other things, an agreement, here the Restructuring Support Agreement, between the GDB and a critical mass of its bondholders, oversight board certification, solicitation and voting by affected bondholders, here pursuant to the solicitation statement, and court approval or confirmation order, here the 2018 approval order. And this qualifying modification also required implementing legislation by the Puerto Rico government, here called the GDB Restructuring Act. And it's undisputed. And Judge Swabe specifically found on page 17 of her decision that we're appealing, that's at addendum page 17, that the 2018 approval order stated that the approved, integral and binding terms of the qualified modification were found where? In the RSA and the solicitation statement, both of which clearly, undisputably contained in black and white the valid claim requirement. Thus, at each and every one of these steps required by PERMISA and Puerto Rico statute, the valid claim requirement was part and parcel of the qualifying modification. Counsel, can I just direct you to sort of what to me seems the central issue, which is the documents that you're talking about, the preliminary documents, were expressly subject to the terms and conditions of the later definitive documents, the definitive agreements. And as I understand it from the briefing, both the bond indenture and the MTA were submitted on the record, and you had a chance to object to their terms and point out that the valid claim requirement was not included and you didn't. Why doesn't that address your issues here? Yes, because, again, what would make the paradigm was a term sheet, which we call the RSA, and then there's definitive documents that implement the terms of the term sheet. Like in normal contracts, Your Honor would be precisely right. The thing here that you have to remember that this was a series of agreements and documents among different parties, all of which together form the qualified modification under Title VI. What do I mean by that? What did this require? This required lots of different things. This required, for example, an agreement between the GDB and a substantial number of its bondholders. This is all according to PERMISA. That agreement is the RSA term sheet. It required other things as well. It required a master transfer agreement. That agreement was with different parties. That was an agreement between the GDB and the DRA, which is the terms that they're transferring certain assets. Counsel, I understand your arguments. There are a lot of parties involved and there are agreements between different people, but the question that I just want to focus you on is the interests that you're representing here today. Before the approval order was entered, the bond indenture and the MTA were placed on the record. Aren't the parties that you're representing here today, didn't they have the opportunity to look at them and say, there is no valid claim requirement in these documents, so please don't go ahead and approve? Two answers, Your Honor. Number one is look at paragraph 13 of Judge Swain's confirmation order. What she says very clearly is that the terms of the qualified modification are the terms in the RSA and solicitation. Counsel, I'm asking you a factual question. Can you just respond to the factual question? Absolutely. Didn't the parties that you represent have the opportunity to object? Absolutely. They were in draft form submitted to the court in 2018. But the reason why he didn't object is because these were agreements between different parties that implemented the RSA. And those documents specifically say that they have to be subject to and in accordance with the RSA, sorry, it has to be qualified modification and the GDP Restructuring Act. It says that on the very first page of the indenture. It says this indenture, which is, we'll get back to it, but this indenture is to implement and must be in accordance with what? It has to be in accordance with the qualified modification, which we know what that means. That's the term sheet. It has to be in accordance with the GDP Restructuring Act, which we know. So the argument is that even though the valid claim requirement was not expressly included in those documents, the parties you're representing thought it was implicitly incorporated? Yes, of course, because it said it on the very first page of the indenture. But it's more than that. These were agreements between different parties. Again, the indenture is an agreement between the indenture trustee of the bondholders and the DRA. Think about the indenture is about like what? If you're a bondholder, what are your rights? It's about the what are your rights? Who is a bondholder is not in the indenture. Who is a bondholder is a different agreement. That's the RSA and the term sheet. So it's a difference between who is a bondholder that you look at this document. What are the rights of the bondholders? You look at that document. It's a difference between who gets to be in the room versus, OK, once in your room, once you're in the room, what are the terms and conditions? And that's what's so kind of frustrating about this case. It's not like we were asleep at the wheel. It's the same reason you have. I don't know. You're buying a house. Right. And you have a sale document and you have a punch list that a term of the sale is you. You sell or have to complete these these items. And then you have a mortgage agreement with your bank. And the mortgage agreement doesn't have that punch list. And then someone said, well, the seller then says, I don't have to fulfill that punch list because it's not in your mortgage agreement. It's documents that do different things. The RSA, again and again and again, is defined as the qualified modification. Who gets the bonds? The indenture and the master transfer agreement that they keep on pointing out were entirely different parties. The master transfer agreement is between the DGDB and the DRA. And the indenture is between the indenture trustee and the DRA. That's like, what are your rights? And it has things like taxes. And but it's not. And how do I know I'm right? Well, I know I'm right because it's different parties. And it's kind of like basic contract law that that contracts between different parties can change contract between other parties. But it's also because the master service agreement and the and the indenture say that this is this is in accordance with the qualified modification. There's nothing in there that says this supersedes the qualified modification. It couldn't because it's different parties. But it certainly takes into account. But the indenture says that they can issue additional bonds. And so the issuance of additional bonds is, of course, going to impact the rights of the parties that you're representing. So why, again, why, given that fact, wouldn't the parties that you represent then raise Section 2.13 of the bond indenture? It says without the consent of the bondholders shall be authorized to issue additional bonds in respect of the contingent claims in an amount not to exceed $62 million. Right, because additional bonds is a defined term. And that what are the terms of additional bonds? You look at the RSA and the solicitation statement and they say, when can you issue these additional bonds? Only if the following if the following contingency is right. And because, as you know, the solicitation statement goes on to say not only that, but the chance of this contingency happening is, quote, unquote, very low. So, again, you'll have your aha moment once you realize that we're not talking about a contract, a term sheet, and then a contract. We'd lose that. Of course, we'd lose. We're talking about a series of agreements, all of which together form the Title VI, right? And the term sheet, the RSA, the solicitation statement, survives because they're all incorporated by reference. Look at Paragraph 13 of the confirmation order. It says, what are the terms? Look at the RSA and the solicitation statement. Period. Full stop. Paragraph 14 that the judge talks about then doesn't say anything different. It just says you have to implement, you have to also do these other steps down the line so that you have a nice, tidy Title VI. But there's nothing, not a word, not a whisper, not a hint in the confirmation order that somehow, some way, terms clearly in the solicitation statement and RSA can be extracted by agreements between other parties. Judge Lopez, do you have any questions? Yes. Counsel, you seem to rely on the, well, you are relying on the proposition that this valid claim requirement because of the solicitation statement and the restructuring term sheet, that the definitive agreements had to be consistent with that requirement. That seems to be your position. In her decision, Judge Swain has this footnote. I'd just like to read it to you quickly. It says, although the definition of definitive documents in the GEP RSA stated that some documents were to be, quote, in each case on terms and conditions consistent with the restructuring term sheet, the reference to the term sheet, and this is what's critical, I think, the reference to the term sheet was automatically deemed to be a reference to the relevant definitive documents upon the execution of the definitive agreements. Would you comment on that proposition? Yes. Because it seems to be a response to the critical point that you're making. Two responses. Judge Swain made two mistakes with all due respect in that footnote. Number one, definitive documents, the definition of definitive documents include specifically the term sheet, the RSA, the judge's approval order, as well as the solicitation statement. She's saying as opposed to the RSA, the definitive documents went out. But what the judge didn't go back and look at the definition of definitive documents include the RSA itself, as well as the solicitation statement, as well as the approval order, all of which make clear that the valid claim requirement is there. The second answer, Your Honor, is what we were taught. So right off the bat, looking at nothing else, just the judge misreads the word definitive documents, means something other than the documents that actually have the valid claim requirement. Look at the definition. It's in black and white. The other answer is, Your Honor, it's because of the mistake the judge made was, again, just falling into the mistaken paradigm of a term sheet followed by a definitive contract. Here it's that the latter supersedes the former. As we've been discussing, that's just not what happened here. Here there was a series of contracts and agreements and documents among different parties. Again, the RSA, that's what started the whole Title VI, was an agreement between the bondholders and the GDB under what terms will they take 50 cents on the dollar and cancel their old bonds and get new bonds. And that had the valid claim requirement. You can argue they're definitive documents, but note that the definition of definitive documents doesn't include either the indenture or the manslaughter transfer agreement. Let me say that again. Definitive documents don't even include explicitly the manslaughter transfer agreement and the bond indenture. They include my documents, not their documents. But putting that aside, the problem was is that Judge Swain fell into the trap of thinking that they were addressing the same things. Someone was asleep at the wheel. Too bad, so sad. You didn't remember to put the terms in the term sheet into the definitive documents, so you lose. But that is wrong for the reasons we talked about. Number one, definitive documents include specifically the RSA confirmation order and the solicitation statement, but also there are agreements between different parties. And the reason why it's not in the bond indenture, it's because it's not relevant to the bond indenture because the bond indenture is about what are your rights if you're a bondholder. The solicitation statement and the RSA is about who gets to be a bondholder and where is the valid claim requirement required. It's when who gets to be a bondholder, not what are the rights once you're in the room of bondholders. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the appellant, Ameri-National Community Services, LLC, please introduce himself on the record. Good morning, Your Honors. Attorney Nigel Zurabani of McConnell-Valdez, LLC, on behalf of Ameri-National Community Services, LLC, as a servicer of the GDBDRA. So, Your Honor, I've been tasked with addressing two particular issues. The first has to do with the DRA party standing. The second has to do with a point of equitable movement, so I'll be very brief. The district court correctly concluded that the DRA parties have standing to challenge the proposed new bonds that were issued here. They have standing because they're contractually charged with protecting the interests and rights of the DRA and their DRA bondholders. So, with respect to the servicer, Section 1.02B of the servicing agreement expressly provides that the servicer is engaged by the DRA to use commercially reasonable efforts to enforce the DRA's rights under transfer agreement. In turn, yes? Can I ask you this question? It seems sort of incompatible to me that you argue that the MTA gives you contractual standing, yet at the same time, the DRA parties are not subject to the specifics of the MTA? So, it's a correlation between the MTA, for example. Because you're not parties to that. Could you address that? Yes, I will. So, with regards to the MTA, you are correct. We are not parties to the MTA, but there's a correlation between the MTA, the servicing agreement, the collateral monitor engagement letter, and the bond indenture. So, it is between the merit of those documents in which we find the answer. So, I'll explain. Under the MTA, the DRA is, among the rights that are conferred include the issuance of the bonds when they're directed to be issued in accordance with the qualifying modification. The servicing agreement later on, the DRA delegates upon the servicer to use commercially reasonable efforts to enforce the DRA's own rights. The same rights that were conferred under the MTA. So, MTA granted it to the DRA. The DRA, in turn, turned around and granted it to the servicer. You now are delegated on my behalf to protect and enforce my rights. So, in a situation like this, when the DRA has been asked to issue bonds, which we posit were illegally asked to issue the new bond, that impairs the DRA's rights. And because the servicer has been expressly granted by the DRA the power to enforce those rights, now the servicer is here standing. And then with regard to the collateral monitor, under the collateral monitor engagement letter, the collateral monitor is tasked with the interest of the bondholders. Of course, if you issue new bonds, which is the argument that the appellants have, these new bonds were illegally issued. It dilutes the value of all the DRA bondholders, definitely has an impact on the bondholders. In order for Ameri-National to have standing, do we have to decide if the MTA grants to DRA the right to issue, to object to the issuance of bonds? So, I believe with regards to that particular question, it's a bit of a non-issue. And the reason why I say that is during argumentation before the district court, I believe everyone was in agreement that the DRA would have had standing. Article III standing, other types of standing with regards to the issuance of the bonds. So, that is an issue that's not in dispute. Well, I know everyone agreed to it, but don't we have to decide it? No, I understand. I understand, but then my position to that would be that I believe all parties were in agreement that the DRA, or at least I would posit that the DRA would definitely have Article III standing with regards to the issuance of the new bonds and challenging that specific point. Now, Your Honors, I know my time is up, but I haven't had an opportunity to discuss the issue of equitable mootness. Please discuss. Okay, so I'll be very, very brief. Two particular points. Whether equitable mootness should apply to a Title VI case is an issue of first impression. And our position would be that this court should decline the Apley's invitation to extend that. The reason for that is very clear. Title VI is not a bankruptcy proceeding. It's not Title III. The equitable mootness should apply strictly to the specific provisions of where it applies in the bankruptcy context, which this is not a Title VI. And as Mr. Kamenetzky just explained, Title VI operates as a completely different beast. That's my first point. Aren't Title VI proceedings somewhat equitable in nature in that even if they're sort of smaller in scope than Title III, they still result in significant debt restructuring? So could we? Can I respond to this? Yeah, please. So I think the main distinction here is that a Title VI case, contrary to a bankruptcy proceeding or a Title III, the issue is that it has to be consensual. You cannot do a nonconsensual Title VI. Unlike a bankruptcy case where you could have a crammed-down confirmation or you could have somewhat consensual in terms of voting for the plan, there is a specter of a group, hypothetically, could be who did not consent to the bankruptcy and are still going to be bound, assuming that all confirmation requirements are met. So because there is this specter that, quote-unquote, innocent parties could be affected by the bankruptcy decision, even if they enforce all of their rights, and you need to make sure that there's finality to the bankruptcy process, that's why it makes sense that equitable moodness applies here. Title VI, unless everyone comes in holding hands and singing kumbaya, it's not going to happen. So that is one of the main distinctions why we believe, on an issue of first impression like this one, equitable moodness should not even be considered. Having said that, though, even if this Court were inclined to consider it, we still believe that in these particular circumstances, none of the elements for application of equitable moodness apply here. Why is that? Well, let's start with the first factor. Whether appellants diligently pursued a stay, it is uncontested in the record that that is exactly what appellants did. From day one, they bifurcated the issuance of the new bonds between the approval of the QM, just to not impair and allow for that to occur, so that all parties could dispute whether these bonds could be issued. Aside from doing that, when the Court issued a decision, appellants moved expeditiously before the district court to seek a stay. When that stay was denied and the appeal was filed, we, again, immediately moved to seek a stay before this Court. Now, the appellees do not cite a case that mentioned that even after doing all of these efforts and being diligent in pursuing the stay, that equitable moodness should apply just because it was denied. I think everyone, from the appellant's perspective, they move and they satisfy that first. The first factor, therefore, is not satisfied here because they were diligent. The second and third factors, we can look at them jointly, which is that the issuance of the additional bonds has not proceeded beyond any practical annulment and the reversal of the erroneous decision below will not harm third parties. Why is that? Again, we bifurcated from the first point the issue of the issuance of the new bonds and, as well, the approval of the qualifying modification. Aside from that, from day one, the QSIPs, when these bonds were ultimately issued, are issued with a different QSIP number than the other DRA bonds, so any purchaser of these bonds know that they are different in nature from all the other DRA bonds. And why is that? Because they knew these were subject to a bona fide dispute. In fact, in the offering memorandum back in December 2023 for these new bonds, there was an express warning that this was subject to an ongoing litigation, which means that the additional bonds could be canceled for no consideration. So the fact that everyone bifurcated from day one, when the bonds were issued, an express warning was made to the markets and to the public, and including the fact that this could be reversed subject to this ongoing dispute, means that, unlike a typical case of equitable mootness, there is no quote-unquote undoing of the baby. Everyone knew that that possibility was baked in when this dispute arose, since the district court and continues here. So because none of the three factors for equitable mootness applies here, even if the court accepts the invitation to extend it to a Title VI case, it should not be applied here and should not be an impediment. Your time is up. Let me see if Judge Lopez has any questions. No, thanks. Thank you. Thank you. Thank you, Counsel. At this time, if Counsel for the APALE, the Puerto Rico Fiscal Agency and Financial Advisory Authority, would please introduce himself on the record to begin. May it please the Court. Matthew Kramer of Old Melbourne and Myers on behalf of AFAWF. I will address the overall merits of whether the additional bonds can be issued under the operative transaction documents. Mr. Andrew Bellman and Mr. Peter Vontal will address the issues of standing in equitable mootness. So to address some of Mr. Kamenetsky's points. First, Your Honor, the transaction documents were in fact filed with the court several days before the confirmation hearing, as Judge Swain noted in her lower opinion. But it's much more than that. These documents were extensively negotiated with the requisite bondholders. That is a defined term under the RSA. Mr. Kamenetsky's firm represented those requisite bondholders, and they had approval rights over these documents. So besides the fact that they were filed with the court and no bondholder, no requisite bondholder or otherwise, objected to those documents, they were also continued to be negotiated and finalized, and the RSA parties provided their consent in final sign-off to those agreements, and the DRA went on to execute those agreements. So you would say the DRA parties had a meaningful opportunity to raise objections and didn't do so. Absolutely. They were the principal party negotiating and drafting and negotiating these documents. Counsel, their argument, though, is they understood the terms that they think are the critical terms have been incorporated, so they had no reason to object. So can you address that? Yes, Your Honor. So this whole concept, right, that the terms of the qualified modification are set forth in the RSA in the solicitation statement, this is anchored in a provision in paragraph 13 of Judge Swain's order. If you look at Judge Swain's order, what she says there is that she's approving the qualified modification on the terms and conditions set forth in the RSA in the solicitation statement. So if we see that through, what are the terms and conditions of the RSA? Well, first, as Judge Lopez pointed out, one of the terms of the RSA is that once the definitive documents are finalized, those documents replace the term sheet. So when we look back at the RSA as the terms, we have to look at the terms of the RSA, which clearly provide that once we finalize, once the RSA and the requisite bondholders provide their approval for the final definitive documents, those documents replace everything in the term sheet. But how are we supposed to understand that when the RSA is part of the definition of definitive documents? Your Honor, frankly, it's not. So there's two concepts going on here that I think is causing a lot of confusion. In the final documents, the bond indenture and the master transfer agreement, there's a defined term that is the transaction documents that includes the bond indenture, the master transfer agreement, the keepwell agreement, and other documents that implemented the Title VI. It doesn't include the RSA or the solicitation statement. That's subject to an integration clause that says that this reflects the entire agreement among the parties. There is this concept in the RSA, as there always is, of definitive documents, which includes the solicitation statement and it includes the RSA itself. We have to look at what Section 7 says. It says that at the time that these documents are finalized and approved, they will replace the term sheet. And it uses the term as applicable. And Judge Swain noted this as well, that as applicable, I think cements the correct interpretation here, that only those documents that are implementing the operative terms of the qualifying modification are the documents that replace the term sheet. That would be the bond indenture and the master transfer agreement. Of course, it doesn't include the RSA. The RSA was the document in which this concept existed. How is the RSA? It was already finalized. It obviously would not be a document that would replace it. It does include the solicitation statement, which wasn't subject to anyone's sign-off or execution. It's the operative documents that implemented the qualifying modification. In addition, the DRA parties say that the terms of the RSA are also in the solicitation statement. The solicitation statement suffers from the same fatalities that the RSA does. It says all over the solicitation statement that what's described in there is the expected terms of the bond indenture, but that the final bond indenture, which the solicitation statement says, has to be agreed upon by the requisite bondholders. Again, the firm that Mr. Kamensky, their firm, they have to sign off on those documents and that those final terms is what controls. So even if we look at the paragraph 13 and we give weight to the fact that the qualifying modification terms are on the terms and conditions of the RSA and solicitation statement, you always get back to the transaction documents. That's how this works. No matter where you begin this journey, you end at the transaction documents, and this is all tied up in a bow in the transaction documents, which say that they reflect the entire agreement among the parties and supersede everything that came before it. Now, they say that the indenture is, frankly, irrelevant to this issue because it's not about who is the bondholder. It's about once you are a bondholder. Well, then why does 2.13 exist? Why does 2.13? We have this very, very specific provision in the indenture that tells us exactly how additional bonds are issued. It tells us who can direct the issuance. It tells us who can't object to that direction. It tells us how much additional bonds can be issued, which is an important point, right? Your Honors, this isn't some giant loophole where a FOF and GDB can direct the issuance of additional bonds whenever they would like to do so. There's two claims listed on this schedule for which additional bonds can be issued for. So this was a very specific negotiated term of the bond indenture, 2.13 tells you that it's obviously a term of the bond indenture. And it would only make sense, right? Your Honors, it would be only natural that in the document that grants the power to issue these bonds, that if there was any limitation on the power to issue those bonds, they would be set forth in that document, and it's not there. Let me ask you this question. I'm sorry I'm going to read because the abbreviations here get very confusing. But in terms of the district court's interpretation of the 2018 QM approval order, your position as I see it is that we should defer to the district court's reading and interpretation of that order. But I'm concerned about the district court's explanation in terms of did the court fully explain how its reasoning in 2023 was compatible with the plain text of the 2018 order? For example, the 2018 order says that its approval is based on the QM being executed pursuant to the terms of the RSA in the solicitation statement. But the 2023 order doesn't really explain why those terms are now irrelevant. How should we look at that reading? Your Honor, I think there's several things to that point. Judge Swain told us that when she approved this order, she did so based upon her review of the qualifying modification, which permitted the parties to negotiate the definitive terms of the transaction subject to the approval of the execution of the definitive documents. That is consistent with two paragraphs of her order. Paragraph 13, which says on the terms and conditions of the RSA and the solicitation statement. We just went through that analysis that if you accept that we're looking at the RSA and the solicitation statement as including the terms, well it still gets you back to the transaction documents because both documents very clearly provide that that provides the operative terms. But there's more than that, Your Honor. The next paragraph, paragraph 14 of the approval order, Judge Swain specifically said that this approval of the qualifying modification was subject to and conditioned upon the consummation of the other components of the global restructuring of GDP's outstanding liabilities pursuant to the GDP Restructuring Act, including the execution and delivery of the definitive documents in form and substance satisfactory to GDP, the DRA, and the RSA requisite bondholders. It was right there in the order that this is all subject to the RSA requisite bondholders signing off on these documents. And these documents weren't signed off on, and they very clearly contemplate how additional bonds are issued. But I think we have to assume that the parties meant what they said when they wrote 2.13. It is so specific, and it includes no valid claim requirement. If there was this valid claim requirement, wouldn't there be a way to incorporate it into 2.13? It is just simply not there. But it also says that no bondholder could object. That language, why would that be inserted in 2.13 if there was still a valid claim requirement? There is some aspect of discretion, I suppose, whether or not there's a valid claim or not. But we specifically said that no one can object. The DRA, it says the DRA shall, the issuer shall issue these bonds. They have no discretion to not issue the bonds. It says that no bondholder can object. This provision could not be more clear as to how additional bonds are issued. And so looking beyond this provision, again, we have the master transfer. Well, first off, there is no reason to go beyond the bond indenture because it's crystal clear. But if we did, the next place we would go is the master transfer agreement, which is part of this overall integrated set of documents. And Section 2B of that agreement further enforces that the GDB and AFOB have the absolute discretion to issue these bonds in Section 2B. And the master transfer agreement in Section 25 includes the integration clause. So under basic principles of contractual interpretation, the story has to end here. The parole evidence rule prohibits the admission of extrinsic evidence of prior written agreements to explain the meaning of a contract when the parties have reduced that agreement to an unambiguous integrated writing. That is precisely, Your Honors, what we have here. But they're arguing that they're different parties to the different agreements. So why does that argument work here? Because normally the parole evidence that you're trying to get in is about the specific parties to that particular contract that everyone's arguing about. On that point, as we noted, they were the requisite bondholders who approved the document. These documents were filed, and they had the ability to object. But this integration clause is in the master transfer agreement, and it applies to the bond indenture. A single bondholder doesn't have the ability to go and submit evidence on account of bonds that they hold in the face of an integration clause. The trustee executes that document on behalf of the bondholders, and they're bound by those terms of that document. That is why the trustee had separate counsel that negotiated the bond indenture in the master transfer agreement. That is why the requisite bondholders had their own counsel that negotiated that document. But once it's executed, that document is binding on everyone. It's binding, of course, on the bondholders that elected to hold bonds under that indenture. Judge Lopez, do you have any questions? I don't have a question. I'm just going to use this occasion to offer some gratuitous advice to all the attorneys here. And I speak only for myself, for sure. You know, in a case like this where you're dealing with a role of high finance that may be somewhat unfamiliar to the judges, it would have been very helpful if you had taken some pains in your briefing to explain how all of these parties interrelate to each other. You refer to the fact that there are many parties here, and that's certainly true. I don't think I saw anywhere in the briefing where you actually explained what a valid claim requirement is. I mean, that's obviously central to the dispute. And we can probably figure it out by working our way through all these documents. But it would have been really helpful to me if you had taken some time to really get very basic about what's going on here, who the parties are, how they relate, what exactly a valid claim requirement is. So looking to the future, I would urge you to take very seriously your responsibility to educate the judges about this unfamiliar world. If you really want us to try to fully understand the arguments that you're making, the briefs are quite good, and I'm not suggesting they're not. But they assume, I think, a familiarity of the judges with this somewhat arcane world, and I think it would be helpful in the future if you took some pains in your briefing to educate the judges about some of the background that would be helpful to us in understanding these issues. Looking to the future, but I just wanted to take the occasion to make that point. Thank you for letting me do that. Thanks. Speaking for the appellees, we appreciate the feedback, and certainly we'll take that into account into the future. Thank you. Thank you. Thank you, counsel. At this time, counsel for the U.S. Bank National Association, please introduce yourself on the record. You have a two-minute suspense. Good afternoon, Your Honors. It is now afternoon. My name is Peter Vantall from Hogan Levels. We're the PFC bond trustee. I'd like to pick up on, and I'll be talking about equitable mootness. Not standing. Not standing. Thank you. I want to pick up, Your Honor, with your point about whether we should extend equitable mootness to Title VI. The key was the word equitable. That word came from Pinto Lugo, and what it said is, bankruptcies are inherently equitable proceedings. Despite the claim here that it's all kumbaya, at one point there is an order from a court, and that order from the court binds innocent third parties and other people who order their affairs based on that. So it is similar to a plan of adjustment in Title III, and similar to a reorg plan in a bankruptcy. In reference to those two constituencies brings me to my other points, which is, in some senses, this idea of bifurcation is a bit of a red herring. What the bifurcation said was it alerted people, there's a decision that Judge Swain is going to make later, so be aware of that. Once Judge Swain made that decision in August, the order then said, this is the August 31 implementation order, said the bonds were valid, binding, and enforceable obligations. That's at Addendum 27. At that point, if you're a bondholder and there's no stay, you are allowed to say, I should trade these bonds. What about the express warning that your opposing counsel is talking about? It was a buyer's beware warning. My point, Your Honor, is that the buyer's beware warning evaporates as of the time that Judge Swain issues her decision, because if you look at the qualifying modification, it says until there's an order from the court, it defines the court as a district court. So everyone knew there was going to be a point when Judge Swain had to make a decision on these additional bonds. Once she had done so, it's no different from a plan of confirmation or a plan of adjustment. People have been trading these freely, and those are the people, Your Honors, who will be hurt, whether there's a different QCIP. Whatever that situation is, how on earth is a court going to unwind those transactions at great cost? As my friends admitted in their stay papers, they said it would cost a lot of money and effort to undo this. It is not an easy thing. It is a definition of unpractical. Thank you. Sorry, could I circle back to where you began, and could you just address quickly your views on how we might think about the finality interests involved and whether those interests are strong or stronger in the Title VI context as opposed to the Title III? I think they're the same, Your Honor, because if you recall the Pinto Lugo case and Cooperativa, both involved bondholders. They involved people who were engaging in transactions based on their understanding of what the situation was. So I think it's similar, both in terms of finality and the fact that there are innocent third parties here. Once you have an order that is especially unstayed, I think at that point all bets are off and you're able to trade just as you would in a bankruptcy appeal from a confirmation order. Judge Lopez, do you have questions? Nothing, thank you. Okay, thank you. Thank you, Your Honor. Thank you, counsel. At this time, I have counsel for Far Tree Capital Management. Please introduce himself on the record. You have two minutes, sir. Good afternoon. May it please the Court. Andrew Bellman, Loewenstein, Sandler, on behalf of Far Tree Capital Management. I will be addressing standing. And I'll start by dealing with a question that Judge Montecalvo asked counsel for the servicer, and that was, would the DRA have standing? I may be paraphrasing that question incorrectly, but I think that was the crux of it. You certainly said it more quickly than I did. Would the DRA have standing? From a practical standpoint, it doesn't matter, because below the DRA was nowhere to be found in the in-court proceedings. The bondholders themselves were nowhere to be found in the in-court proceedings, and the indenture trustee was nowhere to be found. But in the hypothetical, would the DRA have standing? I think the answer you come to is no, because to have standing, one of the requirements is you have to have an injury in fact. And all the DRA was facing was a direction to do something that it did not have the discretion under the MTA or under the indenture to refuse to do. Both of those documents say shall. It specifically says bondholder approval is not required. It's just a direction. They had received that direction. They had no injury in fact. There was no economic injury. There was no other injury to the DRA. So for the collateral parties to try and bootstrap standing for themselves by saying, well, you know, we're the DRA's agent. We're given these rights under Section 26 of the MTA. We're here. We're going to enforce the DRA's rights that the DRA itself has, for whatever reason, chosen not to enforce, is a smokescreen. The other issue I think stemming from Section 26, and they seem to rely pretty heavily on Section 26 of the MTA as a basis for standing. It's the generalized assignment of agency to execute the DRA's rights and obligations, is what obligation are we really talking about here? We're not talking about an obligation to go out and service collateral to collect on loans that the GDB owned and transferred to the DRA. We're talking about the obligation to issue bonds. And that is a non-delegable obligation of the DRA. The bonds are in the name of the DRA. The DRA is the party to the indenture. The DRA is the obligor that everybody expects to be getting bonds from. The collateral parties couldn't go out and issue the bonds. The DRA can't assign that obligation. But that's the obligation that the DRA collateral parties are trying to enforce. They're trying to say, no, no, no, we have a right to object to this on behalf of the DRA. But the DRA can't delegate that right. That's not a right that is or could be delegated to the DRA collateral parties. Just one minute. Judge Lopez, do you have anything further? Nothing.  Okay. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the collateral monitor please reintroduce himself on the record? He has a two-minute rebuttal. Thank you. I get Benjamin Kamenetsky for the collateral monitor. I'll be very brief because I don't have much time. But I beg your law clerks to take down the cites because this is complicated stuff. And if you take down the cites, I think we'll all be good. It's indisputed that qualified modification is defined in three places to include the terms of the RSA. That's in the approval order appendix at 567. It's in the oversight board certification appendix 748. And it's at the GDP Restructuring Act at addendum page 55 and page 60. Now, I heard my colleague, Mr. Kramer, said once you finalize the definitive documents, the term sheet goes away. I wrote that down. That is absolutely false. Once again, definitive documents is a defined term in the RSA. And that includes the RSA itself, the solicitation statement, and the confirmation order. My colleague said look to section 7, which is appendix 693. And I urge the court to look at it at section 7 of the RSA. It says once written confirmation of an agreement among the GDP parties and the requisite bondholders on and finalization of the definitive documents, capital D, capital D, then says the RSA shall automatically be deemed amended. Two things. The first clause never happened. And this goes back to this is the first. This is maybe why we got confused here. There was no plan here. The term sheet was the plan. So what that first clause says, and again, 8693 says if there's going to be a plan of reorganization agreed to by the people that agreed to the term sheet, the term sheet goes away, which makes sense. But here there was no plan of reorganization. The term sheet slash the RSA rode through. It was even, and how do I know I'm right? Look at the legislation that we just talked about. Look at all the other documents. The term sheet was the final agreement among the bondholders and the GDP. There was no other agreement. So section 7 doesn't get us the ground, even if you get to the definitive documents, which we know means the RSA itself. Now there was a slight of had. If you notice, at one point counsel started talking about transaction documents instead of definitive documents. Those are two different things, two different definitions. Definitive documents are what the RSA defines. Definitive documents is what the confirmation order talks about. Transaction documents is another term that comes up in the MTA and in the indenture. But that's a completely other thing. Those are talking about like the final implementing documents of the Title VI. So don't fall into that trap. They sound similar, but definitive documents and transaction documents are not the same thing. And let me just conclude by saying that look at Appendix 869, which is the first page of the indenture, and Appendix 588, which says that the indenture must be pursuant to the Qualified Modification and the GDP Act and this indenture. The way they're reading it, this means it says it's pursuant to the indenture and the indenture and the indenture, because they say everything collapses into the indenture. But that's not true. It's three different conditions. Similarly, the Master Transfer Agreement says pursuant to the Qualified Modification and in accordance with the indenture. According to them, it would say pursuant to the indenture and pursuant to the indenture. They call the RSA parole evidence or the Qualified Modification or the solicitation statement, but when the documents themselves, the indenture and the Master Service Agreement, tells you to go look at that, that can't be parole evidence. It's incorporated by reference. Okay, hold on. Your time is up, but do you have another question? Judge Lopez, do you have any further questions? No, thank you. Okay. Thank you, Your Honor. Thank you. Thank you, counsel. That concludes argument in this case.